OPINION
{¶ 1} The defendant-appellant, Mark E. Smith ("Smith"), appeals from the June 9, 2005 Judgment of conviction and sentence entered in the Court of Common Pleas of Marion County, Ohio, following a jury verdict finding him guilty of one count of Aggravated Robbery and three counts of Kidnapping.
 {¶ 2} On December 22, 2004, the Marion County Court of Common Pleas of Ohio indicted Smith for one count of Aggravated Robbery in violation of R.C. 2911.01(A)(1), a felony in the first degree; and three counts of Kidnapping in violation of R.C.2905.01(A)(2), a felony in the second degree. All four counts included a firearm specification. On January 4, 2005, Smith entered a plea of not guilty.
 {¶ 3} On April 7, 2005, the jury trial commenced. On April 11, 2005, the jury found Smith guilty of one count of Aggravated Robbery and three counts of Kidnapping. He was acquitted on all four firearm specifications. Pursuant to the Judgment Entry of Sentencing filed on June 9, 2005, the trial court sentenced Smith to nine years for Aggravated Robbery to be served consecutively with a four year sentence for the three Kidnapping charges which were to be served concurrently with each other, for a total term of thirteen years.
 {¶ 4} On June 13, 2005, the defendant-appellant filed his notice of appeal. On June 16, 2005, he amended the notice of appeal and now raises the following assignments of error:
THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORTDEFENDANT-APPELLANT'S CONVICTIONS FOR BANK ROBBERY ANDKIDNAPPING.
 DEFENDANT-APPELLANT'S CONVICTIONS FOR BANK ROBBERY ANDKIDNAPPING ARE CONTRARY TO THE MANIFEST WEIGHT OF EVIDENCE.
 {¶ 5} On December 22, 2004, Smith was specifically indicted for the following charges:
Count I: Aggravated Robbery [R.C. 2911.01(A)(1)], F1
 Mark E. Smith, at Marion County, Ohio, on or about October 19, 2004, did, in attempting or committing a theft offense, as defined in R.C. 2913.01, or in fleeing immediately after the attempt or offense, have a deadly weapon on or about his person or under his control and either display the weapon, brandish it, indicate the Defendant possessed it, or use it.
Count II[, III, IV]: Kidnapping [R.C. 2905.01(A)(2)], F2
 Mark E. Smith at Marion County, Ohio, on or about October 19, 2004, did, by force, threat, or deception, or in the case of a victim under the age of 13 or mentally incompetent, by any means, remove another from the place where the person was found or restrain the liberty of another person, with purpose to facilitate the commission of a felony or flight thereafter.
 {¶ 6} At the outset, we note that the offenses are not allied offenses of similar import.
The application of the Rance [State v. Rance (1999),85 Ohio St.3d 632] test to aggravated robbery and kidnappingreveals that they are not allied offenses. The aggravated-robberystatute, R.C. 2911.01(A)(1), provides that `[n]o person, inattempting or committing a theft offense * * * shall * * * [h]avea deadly weapon on or about the offender's person or under theoffender's control and either display the weapon, brandish it,indicate that the offender possesses it, or use it.' By contrast,the kidnapping statute, R.C. 2905.01(A)(2), provides that `[n]operson, by force, threat, or deception * * * shall remove anotherfrom the place where the other person is found or restrain theliberty of the other person * * * [t]o facilitate the commissionof any felony or flight thereafter.' Each offense has at leastone element that the other does not, so, under Rance, theyare not allied offenses. See State v. Robinson, 8th Dist.No. 80718, 2003-Ohio-156, ¶ 40.
 State v. Walker, 1st Dist. No. C-030159, 2003-Ohio-7106. See also, State v. Cobbins, 8th Dist. No. 82510, 2004-Ohio-3736.
 {¶ 7} In State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus, the Ohio Supreme Court set forth the sufficiency of the evidence test as follows:
An appellate court's function when reviewing the sufficiencyof the evidence to support a criminal conviction is to examinethe evidence admitted at trial and determine whether suchevidence, if believed, would convince the average mind of thedefendant's guilt beyond a reasonable doubt. The relevant inquiryis whether, after viewing the evidence in light most favorable tothe prosecution, any rational trier of fact could have found theessential elements of the crime proven beyond a reasonable doubt.
 {¶ 8} In contrast, when reviewing whether a verdict is against the manifest weight of the evidence, the appellate court must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 9} In this case, the evidence establishes that on October 19, 2004, at approximately 1:20 p.m., the Marion Community Credit Union located at 810 Kenton Avenue, Marion, Ohio 43302 was robbed. No customers were present during the robbery; however, three employees were present when the robber entered the Credit Union and ordered them to get on the floor. The robber took a total of $9,480.00 from one of the tellers at the Credit Union.
 {¶ 10} The manager of the Credit Union, Elaine Evans, testified that the robber rushed through the Credit Union door and the first thing she heard was, "Give me all your money. Give me all your money." At that point she looked up and saw the robber for two to four seconds. She recalled that her first impression was that the robber's face was just like a clown's face because it was covered with red and white and the brim of a ball cap. She acknowledged that she did not get a good look at the robber's face because the robber ordered her to "Get down. Get down." She got down on the ground and crawled under the counter at the robber's direction. She sat there and waited and listened as the robber ordered the teller next to her to "Get up. Give me the cash in your drawer." Then she heard the cash drawer bang shut and the robber said, "Give me the cash in the other drawer." After she heard the second cash drawer bang shut, she heard the front door chime and the robber was gone. Upon the robber's departure, she pushed the teller panic button and called the police.
 {¶ 11} Jackie Shenefield, a teller at the Credit Union, testified that she was decorating the lobby and was on a ladder when the robber entered the Credit Union. She testified that she was told to get off the ladder by the robber and when she turned around to look at him he pointed a gun at her and repeated that she needed to get off of the ladder. When she got off of the ladder, she observed that the robber had his hand out with the bag and was telling the other teller, "Give me the money" while he was still pointing the gun at her. She testified that the robber had something covering his face which was red, white and blue and patriotic. She observed that the covering slid down off of his face and she saw he had a full white beard. When this occurred he told her to get her face on the floor. Furthermore, she described the robber as a white male about fifty years old, approximately six feet tall and husky, wearing a hooded sweatshirt with another shirt under it. After the robber left, Jackie went over and locked the door and put up the signs that the Credit Union was closed for an emergency.
 {¶ 12} Rose Trudeau, another teller at the Credit Union, testified that she saw the robber burst through the doors of the Credit Union and heard him say "This is a hold up. Everybody down." At that point she pushed back the stool she was sitting on and got on the floor. A few moments later, the robber told her to "Get up" and take the money from the teller drawer and give it to him. Then he ordered her to give him the money in the next teller register. She acknowledged that she did not get a good look at the robber's face; however, she described the robber as approximately six feet tall and hefty. She could not describe his race or whether he had facial hair. She remembered that he had on a hooded sweatshirt and a ball cap. In addition, she stated that she saw the gun twice during the robbery; once when he walked in and once when she got up from the floor.
 {¶ 13} After the robber left and Jackie locked the door, Rose and Jackie observed the robber's vehicle drive away through the drive-thru window. The vehicle was an old Ford truck painted completely blue, including the wheels. The truck also did not have any license plates. Later that afternoon, the truck was found abandoned by the railroad tracks a couple of blocks from the Credit Union. During the inventory of the contents of the vehicle, a red, white and blue bandana, a pair of sunglasses, a red cap, and a number of other items were found, including a receipt from REX TV identifying Tim Blanton as a purchaser on December 23, 2003. An investigation by the police revealed that the truck was registered to Tim Blanton. After speaking with Tim Blanton, the police learned that Tim Blanton had sold the truck to Smith sometime in April of 2004.
 {¶ 14} At trial, Mark Losko, a forensic scientist in the DNA/Serology section of BCI, testified that the DNA found on the cap and bandana matched Smith's DNA. Smith stipulated that his DNA was found on the cap and bandana because they were his belongings. Mark Losko also testified that the DNA was tested in sixteen locations and the results were consistent between the cap, the bandana and the oral swab. He stated that there was no indication of a mixed DNA profile, where two individual's DNA overlap in the sample. Therefore, Mark Losko stated that the statistical calculations indicate that the expected frequency of the DNA profile in this case were 1 in 981 trillion individuals. However, on cross examination, Mark Losko testified that it is possible for no DNA to be found on an article if a person puts a hat or bandana on for twenty or thirty seconds.
 {¶ 15} Jaclyn Brossia testified that her fiancé sold Smith an Oldsmobile car the day before she saw the newspaper article about the Credit Union robbery. She testified that the car was sold for nine hundred dollars to a man that she described as about six-two, kind of stockier with grayish-white hair and longer facial hair. She further stated that the man did not return for the title of the car within the next few days like he said that he would; thus, he never received the title to the car. Tim Endicott, Jaclyn's fiancé, testified that he sold the car to Smith when his friend Leonard Nutter brought Smith over to show him the car. Tim identified Smith in the courtroom as the person that he sold the car to and acknowledged that he knew him as Smitty.
 {¶ 16} Meanwhile an acquaintance of Smith, Lisa Massey and Hollie Adkins, her roommate, were living in Florida. At trial they subsequently testified that Lisa was notified that there had been a robbery in Marion, the authorities were looking for Smith and Lisa should expect a visit from Smith. Lisa pulled up the Marion Star on the computer and found the information about the robbery and shared it with Hollie. Shortly thereafter, Smith arrived. Hollie Adkins testified that she had seen Smith previously when Smith had visited Lisa Massey just a few months earlier. She described Smith as having longer white hair with a beard during the first visit. The next time she saw him after Octoberfest he had shaved his head and his beard, except for a moustache. During her testimony, she did identify Smith as being the individual that she was referring to.
 {¶ 17} Hollie Adkins also testified that Smith discussed a robbery in Marion, Ohio between ten and fifteen times during the two weeks following his arrival in Florida. She explained that Smith said that during the robbery his face was covered but the employees of the Credit Union couldn't see his face. He also said that during the robbery he did have a gun; however, Hollie testified that she had not seen the gun, nor could she describe the gun that was used. Smith also said that he had left the truck behind and purchased another car to drive to Florida. Hollie testified that Smith did not tell her how much money he got from the robbery, but she did observe that he had a fair number of bills but not a huge wad of money. About two to three weeks after Smith had arrived, Hollie decided to move out of Lisa's trailer and to find another place to live. She was uncomfortable with Smith and didn't want to be in the presence of someone who "had robbed a federal credit union in the State of Ohio."
 {¶ 18} On November 22, 2004, Hollie Adkins' mother notified a sheriff regarding Hollie Adkins' story and the situation. On November 23, 2004, Hollie Adkins confirmed the story and situation that her mother had told authorities in Florida and provided more detail to the detective regarding Smith's statements about the robbery of the Credit Union in Marion, Ohio. On December 9, 2004, Smith was arrested in Brooksville, Florida.
 {¶ 19} Additionally at trial, Smith took the stand on his own behalf. First, Smith claimed that he did not match the physical description of the robber. Smith testified that on New Year's Day, 2004 he changed his appearance by shaving his hair and his beard off. He stated that he has kept it fairly short since the beginning of 2004.
 {¶ 20} Second, Smith challenged the State's evidence regarding his ownership of the Ford truck at the time that it was found. Specifically, he testified that he sold the truck to another individual he met at a junk yard when he was scrapping another car. Apparently, the man was looking for an engine and after seeing the truck the man agreed to pay Smith four hundred dollars for the truck. Smith testified that this event occurred sometime between the 13th and 15th of October and that he did not know the man's name explaining that "I never asked him, never needed a receipt, nothing like that. He was buying the truck for the motor of it was his purpose of it so there was a guy at the junk yard."
 {¶ 21} As for the bandana and the cap found in the Ford truck, Smith testified that when he sold the truck he left the contents because he didn't want the man to back out on the sale. Smith admitted that the bandana and the cap were his. Furthermore, he stipulated that the DNA found in the bandana and the cap were his.
 {¶ 22} Finally, Smith challenged the allegation that he fled to Florida. Smith testified that he sold some vehicles and tied up some loose ends with the intention of going to Florida to visit Lisa Massey and to work on hurricane destruction for money, not to flee Ohio; that he purchased an Oldsmobile from Jaclyn Brossia's fiancé, Tim Endicott as a good, dependable car to get him to Florida and around for work; and that prior to leaving for Florida he did visit a friend for a few days to say good-bye. Additionally, Smith presented the testimony of John Smith, Jr., Scott McEldowney, Bobbie Jo McEldowney, Phillip Nicolas Owens, and Lisa Massey to support and corroborate the above testimony.
 {¶ 23} In sum, after viewing the entire record and the evidence in the light most favorable to the State, we can say that a rationale trier of fact could have found the essential elements of aggravated robbery and kidnapping proven beyond a reasonable doubt. Based on the above evidence, the State clearly presented evidence that Smith committed a theft offense with a deadly weapon. In addition, the State provided reasonable evidence that Smith committed a kidnapping by restraining the liberty of three different employees of the Credit Union by threat with the purpose to facilitate the commission of a felony. Therefore, any rational trier of fact could have found the essential elements of the aggravated robbery and kidnapping were proven beyond a reasonable doubt.
 {¶ 24} Furthermore, in reviewing the totality of the evidence, we cannot conclude that Smith's convictions are against the manifest weight of the evidence. While Smith argues that he presented an abundance of evidence to support his above challenges, specifically, his physical appearance, the sale of the Ford truck and its contents and his relocation to Florida, this evidence was all before the trier of fact. The credibility of witnesses is a determination that is primarily for the trier of fact. State v. DeHaas (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus. Further, with respect to the choice between credible witnesses and their conflicting testimony, an appellate court may not substitute its judgment for that of the trier of fact. State v. Awan (1986),22 Ohio St. 3d 120, 123, 489 N.E.2d 277. Thus, we cannot conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
 {¶ 25} Accordingly, the assignments of error are overruled and the judgment and sentence of the Court of Common Pleas of Marion County is affirmed.
Judgment Affirmed.
 Bryant, P.J., concurs.
 Rogers, J., concurs in judgment only.